IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION


**GLORIA H. HENDON,**

      **Plaintiff,**

**vs.**                              **CASE NO. 5:05cv155-RH/WCS**

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**

      **Defendant.**

_____/


## REPORT AND RECOMMENDATION

      This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and local rule 72.2(D).  It is recommended that the decision of the Commissioner be affirmed as to the application for disability insurance benefits and reversed as to the application for supplemental security income benefits.

**Procedural status of the case**

      Plaintiff, Gloria H. Hendon, applied for disability insurance benefits and supplemental security income benefits on August 26, 1998, alleging onset of disability commencing on March 1, 1993.  Doc. 11, p. 1; doc. 14, p. 3.  She was insured for disability insurance benefits only through September 30, 1996.  R. 35.  Plaintiff received

an unfavorable decision on April 26, 2000, after an administrative hearing.  R. 86.  The

Appeals Council remanded for further hearing and to determine disability prior to

February 1, 2002.  R. 121-123.

On April 23, 2003, Plaintiff filed the latest application for supplemental security

income (SSI) benefits.  R. 34.  The latest SSI application alleges onset of disability on

January 1, 1996.  Plaintiff had filed earlier applications for SSI benefits, on June 7,

2000, and February 4, 2002.  Doc. 14, pp. 1-2.  Both applications were granted at the

initial level but later denied because Plaintiff's husband's earnings at that time, for

commencement of those benefits, made her ineligible to receive SSI benefits.  *Id.*; R.

34.  The date of that determination is not known.

The initial application for disability insurance benefits and the latest (April 23,

2003) application for SSI benefits were consolidated for review.  R. 34.  After a second

administrative hearing, an unfavorable decision was entered on June 30, 2004.  R. 33-

50.  The Appeals Council denied review.  R. 11.

The case now before the Court is an appeal from this second round of

administrative decisions.  Doc. 1.  The application for disability insurance benefits

requires proof of disability commencing before the expiration of insured status, on

September 30, 1996.  The application for SSI benefits requires proof of disability

commencing at some time after the date of denial of the of the February 4, 2002,

application,[1] to the date of the decision, June 30, 2004.

---

[1] This would be the date upon which the Commissioner found Plaintiff to be ineligible due to her husband's income, a decision that was not appealed.

Plaintiff was 57 years old at the time of the first administrative hearing on January 12, 2000, and 61 years old at the time of the second hearing on July 30, 2003.  She had an 8th grade education, and had past relevant work primarily as a waitress, a restaurant hostess, and a bartender.  Plaintiff alleges disability due to degenerative joint disease of the cervical spine and shoulders, depression, agoraphobia and panic attacks.  She admits to chronic alcoholism.

The Administrative Law Judge considered Plaintiff's alcoholism only in connection with other mental impairments, that is, depression and agoraphobia.  He found that absent limitations caused by abuse of alcohol, Plaintiff has "no mental limitations that would interfere with her ability to work."  R. 45.  He stated: "In general, the Administrative Law Judge finds that the record does not establish that the claimant has any mental limitations, other than those that are caused by her chronic alcohol abuse/dependence."  R. 44.  In effect, therefore, the ALJ found that if Plaintiff did not abuse alcohol, she would not be depressed or suffer agoraphobia.

Considering Plaintiff's physical impairments, the Administrative Law Judge found that Plaintiff had the residual functional capacity to do a range of light work.  In particular, he found that Plaintiff had the residual functional capacity to stand or walk for 6 hours, sit for 2 hours, use her right hand to lift and carry 20 pounds occasionally and less than 10 pounds frequently, use her left hand to lift and carry less than 10 pounds occasionally and less than 5 pounds frequently, without overhead work or the use of her shoulders to perform repetitive activities.  R. 49.  He then found that Plaintiff was able to perform her past relevant work as a hostess during all times relevant to both applications.  R. 50.

**Legal standards guiding judicial review**

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983)(citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002).  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted).  The Court must give "substantial deference to the Commissioner's decision." Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing Court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to

determine whether the conclusions reached are rational.' "  <u>Cowart v. Schweiker</u>, 662

F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the

claimant is not only unable to do his previous work, "but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work

which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an

"inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12

months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must

be expected to last not less than 12 months.  <u>Barnhart v. Walton</u>, 535 U.S. 212, 122

S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairments?

3.      Does the individual have any severe impairments that meet or
        equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.      Does the individual have any impairments which prevent past
        relevant work?

5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits.  A positive finding at step three results in approval of the

application for benefits.  At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work.  If the claimant

carries this burden, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Analysis**[2]

**Plaintiff's testimony**

Plaintiff testified at her first administrative hearing (on January 12, 2000) that her most recent work as a waitress involved having to stand for long periods of time and having to lift up to 20 pounds of racks of glasses or dishes.  R. 892.  She said that her work as a bartender also required lengthy periods of standing and lifting a case of beer. R. 893.

Plaintiff said that stopped working in 1992 (actually 1993) after a fall which injured her shoulder and ribs.  R. 894-895.  She said that after Dr. McArthur operated on her left shoulder, the injury did not heal and she still could not lift any weight with that shoulder.  R. 896-987.  She said her symptoms stayed the same, but lifting was more impaired.  R. 898.  In 1996, Dr. McArthur restricted Plaintiff to no overhead work, no

---

[2] Pharmacological definitions are from PHYSICIANS' DESK REFERENCE , available from WestLaw.  Definitions of medical terms are from DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, available at:

http://www.mercksource.com/pp/us/cns/cns_hl_dorlands.jspzQzpgzEzzSzppdocszSzus zSzcommonzSzdorlandszSzdorlandzSzdmd_a-b_00zPzhtm.

lifting greater than ten pounds for any period of time, and no repetitive shoulder activity.
R. 901-902.

Plaintiff admitted that she had a problem with alcohol abuse.  R. 902.  During the
period from 1993 to 1996, she said that sometimes she drank a case of beer a day.  R.
903.  She said she did this on and off for four or five years.  R. 904.  She had never had
legal difficulties due to drinking, and had not lost any jobs due to drinking.  *Id.*  She said
she had been provided inpatient treatment for alcohol abuse several times and had
been through detoxification programs.  R. 905.  She was unable to maintain her
sobriety, however.  R. 906.  Plaintiff admitted that since 1996 to the date of this hearing,
in 2000, she has continued to drink beer.  R. 907.  She said that when she begins
drinking again, she is soon up to twelve to fourteen beers a day.  *Id.*  She quit and then
returned to drinking a number of times.  R. 908.  She said she was happier with her
current marriage, and she did not "reach for the alcohol as much."  *Id.*  She admitted,
however, that she had been drinking from time to time in the previous year.  R. 912.
She said she had been to Alcoholics Anonymous many times.  R. 910.  Plaintiff said
that the only behavioral therapy she had attended was for depression and alcohol
abuse.  R. 911.

Plaintiff said that she began having panic attacks about five or six years earlier.
R. 913-914.  She said she did not have panic attacks frequently.  R. 914.

Plaintiff said that her husband had medical insurance and it covered medications
after she met the $200 deductible.  R. 916.  She was unaware of the availability of free
mental health care, and had not sought out such services.  R. 917.

Plaintiff testified that she could, at most, stand for an hour doing work, and would have to sit alternatively.  R. 918.  She said she could sit for "a lot longer than an hour I guess if, you know, I wanted to."  *Id.*  She thought that she would have to get up from sitting before the end of two hours.[3]  R. 918-919.  She said she did not have much strength in her right arm, but could use it better than the left arm.  R. 919.  She used to be left handed, but uses her right hand as the dominant hand now.  *Id.*  She thought that she could lift 20 pounds with her right arm once or twice a day, and 5 pounds with her left arm.  *Id.* And R. 926.  She thought that picking up 10 pounds with her right arm was "more realistic."  R. 926.  She said her left hand was stiff and had "no grip in it."  R. 923.  She said that if she did heavier work, she would suffer pain and have to lie down.  R. 925.  She said she cleaned her house everyday, but it took all day.  R. 924-925.

At the second administrative hearing on July 30, 2003, Plaintiff testified that she previously worked as a hostess at a restaurant, greeting customers and seating them, and doing financial reports at the end of a shift.  R. 938.  This job required that she stand during most of the shift, but there was no lifting or carrying anything other than menus.  R. 939-940.

Plaintiff also worked as a supervisor of waitresses at another restaurant.  R. 941.  In that job, she had to wait on tables, move cases weighing up to 60 pounds, and be on her feet 12 to 14 hours a day.  R. 943, 951.  She also had to lift trays weighing up to 10

---

[3] The question was aimed at evidence of ability to stand or sit in the period from 1993 to 1996, but Plaintiff turned the question around, answering it with information about her ability to stand "yesterday."  R. 918.  The remainder of the responses focused upon Plaintiff's ability to sit or stand at the time of the administrative hearing, not in the period from 1993 to 1996. R. 918-919.

pounds over her head.  *Id.*  She also worked as a regular waitress in that job.  R. 955.

Finally, Plaintiff worked as a hotel desk clerk and as a bartender serving beer and wine.

R. 944-946.

Plaintiff said that she had not had any alcoholic beverage for three years, seven

months.  R. 975, 977.  She said she had not needed detox treatment since 2000.  R.

976.  She said that her testimony from the prior hearing, that she drank a case of beer a

day, was error because she was nervous, and she meant to say that she drank a six

pack a day.  R. 978.

The ALJ presented a hypothetical that covered the limitations that he found

applicable to Plaintiff described above.  That is, he assumed that Plaintiff had the

residual functional capacity to stand or walk for 6 hours, sit for 2 hours, use her right

hand to lift and carry 20 pounds occasionally and  less than 10 pounds frequently, use

her left hand to lift and carry less than 10 pounds occasionally and less than 5 pounds

frequently, but with no overhead work or the use of her shoulders to perform repetitive

activities.  R. 49, R. 991-992.  The vocational expert testified that such an individual

would be able to perform the work of cashier II, hostess in a restaurant, head waitress

as defined in the Dictionary of Occupational Titles, and the hostess job as Plaintiff

performed it.  R. 992-993.

### Whether the ALJ's finding that Plaintiff can perform her past relevant work is supported by substantial evidence

The ALJ found that Plaintiff was restricted somewhat in ability to do light work.

R. 49.  The restrictions, however, were found to be insufficient to preclude the ability to

do Plaintiff's former work as a hostess in a restaurant, as well as other jobs described in

the Dictionary of Occupational Titles.  Thus, the important issue is whether the residual

functional capacity determined by the ALJ is supported by substantial evidence in the

record.

The Commissioner's rules define "light work" in part:

Light work involves lifting no more than 20 pounds at a time with frequent
lifting or carrying of objects weighing up to 10 pounds.  Even though the
weight lifted may be very little, a job is in this category when it requires a
good deal of walking or standing, or when it involves sitting most of the
time with some pushing and pulling of arm or leg controls.  To be
considered capable of performing a full or wide range of light work, you
must have the ability to do substantially all of these activities.  If someone
can do light work, we determine that he or she can also do sedentary
work, unless there are additional limiting factors such as loss of fine
dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b) and 416.967(b).

*"Frequent" means occurring from one-third to two-thirds of the time*.  Since
frequent lifting or carrying requires being on one's feet up to two-thirds of a
workday, *the full range of light work requires standing or walking, off and
on, for a total of approximately 6 hours of an 8-hour workday*.  Sitting may
occur intermittently during the remaining time.  The lifting requirement for
the majority of light jobs can be accomplished with occasional, rather than
frequent, stooping.  Many unskilled light jobs are performed primarily in
one location, with the ability to stand being more critical than the ability to
walk.  They require use of arms and hands to grasp and to hold and turn
objects, and they generally do not require use of the fingers for fine
activities to the extent required in much sedentary work.

Social Security Ruling 83-10 (emphasis added).[4]

Plaintiff contends that the evidence of her degenerative disk disease at C5-C6,

left shoulder injury without healing, right shoulder injury, the opinions of Dr. McArthur

and Dr. Abdelghany, and Plaintiff's subjective testimony, show that she cannot stand for

6 hours a day and thus cannot do her past relevant work or the jobs identified by the

---

[4] Available at: http://www.ssa.gov/OP_Home/rulings/di/02/SSR83-10-di-02.html.

vocational expert.  Plaintiff argues that she cannot be constantly in a standing position because that would require use of her neck, shoulder, and back muscles, which are weak and this would cause significant pain.  Doc. 11, p. 24. Plaintiff also contends that the ALJ did not adequately consider the effect of depression and agoraphobia on her ability to do the jobs identified by the vocational expert.  *Id.*, p. 25.

### Mental impairments

The question of disability is complicated by Plaintiff's admitted abuse of alcohol, and that issue must be reviewed first.  "An individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled."  42 U.S.C. S 423(d)(2)(C).  "[T]he claimant bears the burden of proving that his alcoholism or drug addiction is not a contributing factor material to his disability determination."  Doughty v. Apfel, 245 F.3d 1274, 1280 (11th Cir. 2001).

"If the ALJ is unable to determine whether substance use disorders are a contributing factor material to the claimant's otherwise-acknowledged disability, the claimant's burden has been met and an award of benefits must follow."  Brueggemann v. Barnhart, 348 F.3d 689, 693 (8th Cir. 2003).  "A finding of disability is, in effect, a 'condition precedent' to applying the special rule on alcoholism and drug addiction."  *Id.*, citing 20 C.F.R. § 404.1535 and Frank S. Bloch, BLOCH ON SOCIAL SECURITY § 3.39 (2003).  "The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether

we would still find you disabled if you stopped using drugs or alcohol." 20 C.F.R. §
404.1535(b)(1).

Defendant agrees that the evidence does not show that Plaintiff's alcohol abuse
is a contributing factor material to a determination that her *physical* impairments cause
disability.  Doc. 14, p. 8.  Thus, alcohol abuse is only relevant to whether Plaintiff suffers
any mental impairments.

As noted above, the ALJ must have found that Plaintiff was disabled by her
mental impairments, including her alcoholism, since that is the way the analysis must
proceed.[5]  After excluding any mental limitations caused by alcoholism, the ALJ found
that Plaintiff had "*no* mental limitations that would interfere with her ability to work."  R.
45 (emphasis added).  In other words, he determined that the evidence showed that if
Plaintiff did not abuse alcohol, she would not suffer any work-related limitations due to
depression or agoraphobia.  If this finding is supported by substantial evidence in the
record, then Plaintiff's disability claim must depend entirely upon physical limitations.
Accordingly, it is important at the outset to consider whether substantial evidence exists
in this record to support the conclusions that Plaintiff has no mental limitations
unconnected with alcohol abuse.

In reaching the conclusion that Plaintiff would not have any mental health
limitations were it not for her alcohol abuse, the ALJ noted the opinion of Dr. Jesalva

---

[5] Defendant states: "Although the ALJ did not specifically find that Plaintiff's mental
limitations as a result of her mental impairments would preclude employment, it is
evident from her limitations that her [sic] caused by her alcohol abuse, that she would
be unable to perform any work."  Doc. 14, p. 6 n.2.  Defendant contends that the ALJ
found that "from a mental standpoint (not considering any physical impairments),
Plaintiff would be disabled taking into consideration her alcohol abuse."  *Id.*, p. 7.

from September, 1998.  R. 44.  He found that Dr. Jesalva reported that Plaintiff "does

not suffer from a [mental] condition that interferes with her daily functioning and that she

does not require medication or formal treatment."  *Id.*  Dr. Jesalva was a treating

physician from July 16, 1997, through August 7, 1998.  R. 512-520.  On September 4,

1998, Dr. Jesalva rendered the opinion on a form that Plaintiff does not suffer from a

mental impairment that significantly interferes with her daily functioning, and does not

require medication for any such condition.  R. 512.  Dr. Jesalva had noted, however,

that Plaintiff had a history of panic attacks, R. 520, and he had prescribed Xanax,[6]

Desyrel,[7] and Librium[8] over the entire year.  R. 512, 516-520.  These medications are

prescribed for anxiety and depression.  The opinion of Dr. Jesalva is not substantial

evidence in the record to conclude that Plaintiff did not have a mental condition that

required medication or formal treatment, and the ALJ's reliance upon this opinion was

error.

The ALJ next cited the evaluation of Luis N. Zumarraga, M.D., who conducted a

consultative mental health evaluation on May 18, 1999.  R. 44.  The ALJ relied upon this

evaluation for the finding that except for her drinking problem, Plaintiff had no mental

impairment that would adversely affect her work-related mental capabilities.  *Id.*, citing

R. 552.  This finding is supported by substantial evidence in the record.  Dr. Zumarraga

---

[6] Xanax is prescribed for management of anxiety disorder.  PHYSICIANS' DESK REFERENCE (2004), p. 2798.

[7] Desyrel is trazodone hydrochloride, an antidepressant.  PHYSICIANS' DESK REFERENCE (2002), p. 518.  It is not later editions.

[8] Librium is a "versatile therapeutic agent of prove value for the relief of anxiety."  PHYSICIANS' DESK REFERENCE (2004), p.1713.

noted that he had been the attending physician in 1996 when Plaintiff was confined in a

psychiatric hospital and when she was treated as an outpatient in August, 1996.  R.

551.  Thus, he was not just a consultative physician, but a former treating source.

Plaintiff, in effect, reported that she had not suffered spousal abuse in the prior few

months, and "did not seem worried or on edge."  R. 552.  He said that "she seemed a

very nice friendly lady and displayed no symptoms that would preclude her being able to

interact appropriately with coworkers, supervisors or the general public."  *Id.*  He noted

that she reported prior diagnoses of depression and agoraphobia, but he said that:

> from clinical interview, verbalizations and behavioral observations, I
> cannot substantiate these diagnoses today.  Except for her drinking
> problems I really cannot find mental impairment that would adversely
> affect her work-related mental capabilities.

He found no evidence that day of any alcohol use, and found Plaintiff to be "consistently

polite, cooperative and courteous."  *Id.*  He concluded:

> Her ability to sustain adequate attendance, productivity and attention to
> tasks in a work setting will be dependent on her ability to abstain from
> alcohol, her ability to tolerate pain and her physical limitations.

*Id.*  He thought that Plaintiff's emotional states would be "enhanced if she were able to

resume a productive lifestyle."  *Id.*

The third medical source considered was an opinion by James E. Hord, Jr.,

Ph.D., a clinical psychologist.  The ALJ noted that Dr. Hord had said that Plaintiff was

"very neurotic and she is very much an alcoholic."  R. 44, citing R. 506.  He also found

that Dr. Hord had said that drinking was Plaintiff's primary obstacle to employment, and

said that "if there is anything else that prevents her from working, it is not apparent

through the alcoholic haze."  *Id.*  This finding is supported by substantial evidence in the

record.  Dr. Hord examined Plaintiff on a consultative basis on November 10, 1998.  R.

505.  Plaintiff reported that she took Librium and Desyrel for sleep.  *Id*.  She also

reported having taken other medications in the past, including Prozac.  *Id*.  She had

scars on her chin and eye from a recent beating from her husband, who brought her to

the examination, but she said he had not been as abusive as previous husbands.  *Id*.

Dr. Hord noted that Plaintiff reported being "rather agoraphobic," but he thought that this

was "highly related to her alcohol usage."  R. 506.  Dr. Hord said that Plaintiff's thought

processes "were very neurotic," and her mood and affect were "certainly depressive."

*Id*.  He reported that she admitted she had had alcohol the day before, but felt she was

not honest about her alcohol use as he smelled the "heavy scent" of alcohol on her

breath as she left his office.  *Id*.  He concluded that she was very neurotic and "very

much an alcoholic."  He said, as noted by the ALJ, that "the obstacle in her way from

being able to hold employment is her drinking and if there is anything else that prevents

her from working, it is not apparent through the alcoholic haze."  *Id*.

The fourth medical source mentioned by the ALJ is that from D. K. Vijapura,

M.D., who found that Plaintiff had no neurological impairments, so long as she "gets

psychological help for depression and refrains from using alcohol."  R. 44, citing R. 605.

This finding is supported by substantial evidence in the record.  Dr. Vijapura examined

Plaintiff on a consultative basis on July 7, 2003.  R. 603.  She reported she was taking

Zoloft[9] occasionally, but could not afford the medication.  *Id*.  She reported she had

---

[9] Zoloft is prescribed to treat major depressive disorder, obsessive-compulsive disorder, panic disorder, posttraumatic stress disorder, premenstrual dysphoric disorder, and social anxiety disorder.  PHYSICIANS' DESK REFERENCE (2004), pp. 2891-2892.

never required psychiatric hospitalization for depression.  *Id.*  Plaintiff reported that after being sober for a few years, she had started drinking again about six months earlier, but had been sober the last three weeks.  R. 604.  He found her mood to be mildly depressed.  *Id.*  Dr. Vijapura's diagnosis was adjustment disorder with depressed mood, rule out alcohol abuse.  *Id.*  His prognosis was "[g]ood, provided she gets psychological help for depression and refrains from using alcohol."  R. 605.  He also said he felt her "major limitation is physical in nature."  *Id.*  He found her current GAF score to be 60, with 70 in the past, indicative of very mild limitations.[10]  R. 604.

The only contrary mental health opinion discussed by the ALJ is that from David Loiry, Ph.D.  R. 44, citing exhibit 42F (R. 718-719).  The ALJ discounted Dr. Loiry's opinion because he "did not address the limiting affects [sic] of the claimant's alcohol/dependence."  *Id.*  The ALJ also rejected Dr. Loiry's conclusion that Plaintiff no longer had an alcohol abuse problem, noting that while Dr. Loiry made this statement on September 7, 2000, another physician on September 8, 2000, wrote that Plaintiff had said she had consumed three beers four days earlier.  R. 45.  He also discounted Dr. Loiry's opinion based upon the opinion of Dr. Zumarraga, a treating source, and the opinions of Dr. Hord and Dr. Vijapura.  R. 44-45.  Finally, the ALJ mentioned the contrary opinion of Dr. Elzawahry.  R. 45.

---

[10] "The GAF scale reports a 'clinician's assessment of the individual's overall level of functioning.' *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders* 30 (4th ed. 1994)." <u>Sims v. Barnhart</u>, 309 F.3d 424, 427 n. 5 (7th Cir. 2002).  "A GAF score of 61-70 reflects mild symptoms or 'some difficulty' in those areas, but the individual 'generally function[s] pretty well.' " *Id.*

Dr. Elzawahry was a treating physician from August 6, 2000, to March 28, 2002.

R. 816-852.  On March 28, 2002, and on September 18, 2000, Dr. Elzawahry filled out a

form like the form filled out by Dr. Jesalva, expressing the same opinion, that Plaintiff

did not suffer from any mental impairment that interfered with her daily functioning, and

that she needed no medication for any mental condition.  R. 816, 822.  Dr. Elzawahry

practices with the Brain and Spine Center, L.L.C, and apparently is a neurologist.  R.

847.  He treated Plaintiff for her physical ailments, a foot injury, R. 850-852, spinal

problems, R. 823-838, 847-848, and injury to her ribs, R. 843.  Still, as a treating

physician his opinion as to Plaintiff's mental health was entitled to be given the weight

accorded it by the ALJ.

The evidence from Dr. Loiry, therefore, should be examined in detail.  David A.

Loiry, Ph.D., is a clinical psychologist who examined Plaintiff on a consultative basis on

December 13 and 20, 1999, and on September 7, 2000.  R. 568, 718.  Dr. Loiry noted in

the first interview that Plaintiff seemed to be having a panic attack with hyperventilation.

R. 568.  He reported that Plaintiff had "a very poor history."

> She said she was raped at age 10 and was married to her first husband at
> age 13.  She has had a total of six husbands, none of whom seem to have
> treated her well.  In Dec. '91 her husband then beat her so badly that she
> required brain surgery and was in Bay Medical for 1 1/2 months.  Another
> husband beat her badly also and she said her head was swollen so badly
> they thought she would die.  She spent six weeks in the hospital at
> Tyndall.  Her current husband is also abusive but to a much lesser degree.

R. 568.

Plaintiff said her problems with depression "began when she had an accident and

fell while working at the Navy Base as a waitress."  *Id*.  Dr. McArthur performed surgery

on her left shoulder and also on her left elbow.  *Id*.  Dr. Zumarraga "put her in Rivendell

for three weeks for depression and alcoholism." *Id.* She reported to Dr. Loiry that when

she was released from Rivendell,

> she continued to be depressed and began to develop Agoraphobia. She
> said she gets frantic when she has to leave the house and has panic
> attacks. She only goes out when she has to such as to doctor's
> appointments. She does not drive. She doesn't socialize except with her
> family. She used to take medications for depression but currently cannot
> afford them.

*Id.*

Dr. Loiry observed that Plaintiff's "mood was very depressed and anxious." R.

568.

> Affect was congruent, psychomotor activity was WNL's [within normal
> limits] and speech was appropriate. There were no hallucinations,
> delusions, or loosened associations. Insight and judgment were fair. She
> denied suicidal or homicidal ideation.

*Id.*

Dr. Loiry noted that the "MMPI shows her to be much worse than she presents."

R. 569. He noted acute anxiety, depression with suicidal ideation, and somatic

symptoms, with major symptoms of depression and anxiety. *Id.* "Paranoid ideation is

fairly strong with this lady." *Id.* Plaintiff's full scale IQ was 85, but he thought she had a

higher innate ability, though no higher than the average range. *Id.* Dr. Loiry concluded:

> In addition to physical problems, this lady is so overwhelmed by
> depression and severe anxiety that she would be unable to join the work
> force. She would be unable to interact socially and would probably
> experience panic attacks in a work setting. Her depression also would
> prevent her from maintaining a normal work schedule. Her prognosis is
> not good even if she resumes her medication.

*Id.*

Dr. Loiry completed a form entitled "medical assessment of ability to do work-related activities (mental)," finding that Plaintiff was markedly limited in ability to relate to co-workers, deal with the public, use judgment, interact with supervisors, function independently, and maintain attention and concentration, and was extremely limited in her ability to deal with work stresses.  R. 570-571.  When asked to describe limitations, Dr. Loiry wrote that "This Lady is extremely anxious and depressed.  She is very dependent & has nearly zero stress tolerance."  R. 571.  In his assessment of her ability to adjust to a job, he said that her recent memory was impaired, her concentration was "variable," and "she just barely functions."  *Id*.  He found her to be markedly limited in ability to behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability.  R. 572.  He thought that she was subject to unpredictable panic attacks and has agoraphobia.  *Id*.

On January 28, 2000, Dr. Loiry commented upon the May 18, 1999, findings of Dr. Zumarraga, and agreed that, as Dr. Zumarraga had said, he may have seen her on a good day.  R. 574.  He also noted that patients often make a better presentation than shown on objective testing, and the MMPI that Dr. Loiry administered showed Plaintiff's mental condition to be much worse than she presented.  *Id*.  Concerning Plaintiff's abuse of alcohol and the relationship between that problem and the mental problems noted, Dr. Loiry said:

> She did not appear to have been drinking on the day that I saw her.  Even so, the drinking would not account for the severity of the symptoms which include depression, severe anxiety, suicidal ideation, paranoia, and somatic complaints.  There is also evidence to suggest a neurological impairment.  Given her history with men, I also believe that she is passive to the point of being masochistic.

R. 574.

Dr. Loiry examined Plaintiff again on a consultative basis on September 7, 2000.

R. 718.  He said that Plaintiff's problems with depression, anxiety attacks, and

agoraphobia, had "continued since I saw her in December."  *Id*.  He said that she had

"developed new problems with her back."  *Id*.  She told Dr. Loiry that as a result of a

bone scan and MRI, Dr. Elzawahry diagnosed progressive osteoporosis,[11] a

disintegrating disc, and a pinched nerve in the neck.  *Id*.  He said she had problems

walking, ached a lot, sat on a heating pad, wore a brace with steel rods for support, took

pain medications that made her sleepy, and had been told not to lift items.  *Id*.  He said

that Plaintiff "used to have an alcohol problem but does not now."  R. 719.  Dr. Loiry

concluded with the following diagnoses: major depressive disorder, recurrent and

severe, without psychosis, and panic disorder with agoraphobia.  *Id*.  His prognosis was

poor.  *Id*.

The evidence from Dr. Loiry is substantial evidence in the record for the

proposition that even were Plaintiff to stop drinking alcoholic beverages, she would still

suffer significant limitations from depression, panic attacks, and agoraphobia.  But this

Court's role is to determine whether substantial evidence exists in the record to support

the Administrative Law Judge's decision.

The Administrative Law Judge discounted the first opinion of Dr. Loiry because

Dr. Loiry "did not address the limiting affects [sic] of the claimant's alcohol/dependence."

R. 44.  That finding is supported by substantial evidence in the record.  The only

---

[11] Osteoporosis is the reduction in the amount of bone mass, leading to fractures after minimal trauma.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

mention of Plaintiff's alcoholism in that first examination is the note that Plaintiff was provided inpatient treatment for depression and alcoholism at Rivendell.  There is no discussion about the extent that Plaintiff would suffer mental impairments were she to stop drinking.  On the other hand, the other medical sources relied upon by the ALJ, especially Dr. Zumarraga and Dr. Hord, were well aware of Plaintiff's alcoholism.  Dr. Zumarraga treated Plaintiff when she was in Rivendell.  Dr. Hord noted that Plaintiff had not been entirely honest with him about her dependence upon alcohol as he smelled a strong odor of alcohol when she left his office.

The ALJ discounted the second opinion of Dr. Loiry for much the same reasons, noting that Dr. Loiry erroneously found that Plaintiff "used to have an alcohol problem, but does not now."  R. 45.  Only a day later, on September 8, 2000, another consulting source, Dr. E. Jacob, M.D., said that Plaintiff admitted that she had had three beers about four days earlier.  R. 721.  She admitted as late as the last administrative hearing that although she had "cut back," she was still drinking alcoholic beverages.  R. 903.  For an alcoholic, the drinking of three beers a few days before the examination by Dr. Loiry is substantial evidence in the record for the ALJ to find that Dr. Loiry's premise, that Plaintiff no longer had an alcohol problem, was flawed.

In summary, it is possible, given the hardships that Plaintiff has suffered over her lifetime, that Plaintiff abuses alcohol to cope with depression, anxiety attacks, and agoraphobia.  On the other hand, it is also possible that Plaintiff's alcoholism is the central cause of her experience of depression, panic attacks, and agoraphobia.[12]  It

---

[12] For example, when Plaintiff was admitted for inpatient treatment at Rivendell of Bay County on March 6, 1996, she said that she had been drinking a case of beer or

would be difficult for a layman like the ALJ or this Court to sort this out.  That is why the ALJ and this Court must rely upon evidence from medical sources.  Dr. Zumarraga and Dr. Hord were aware of Plaintiff's alcohol abuse and they both thought that if Plaintiff were to stop abusing alcohol, she would have no significant remaining mental impairments.  This was substantial evidence in the record to discount Dr. Loiry's opinion as to the severity of Plaintiff's mental limitations, absent alcohol abuse.  It was also substantial evidence in the record to find that alcohol abuse was a contributing factor material to Plaintiff's mental impairments, and that were Plaintiff to abstain from use of alcohol, she would have no significant mental impairments.

### Physical impairments

This leaves for consideration, therefore, the evidence of Plaintiff's physical impairments.  As previously noted, Defendant agrees that Plaintiff's chronic alcoholism plays no part in causing any physical impairments and thus is not a factor that must be excluded.

The ALJ determined that Plaintiff has the residual functional capacity to do some of her past relevant work, as well as other similar jobs in the national economy.  R. 44, 48.  The evidence cited by the ALJ to support this conclusion will be discussed ahead. The ALJ relied especially upon the finding of Dr. McArthur, a treating physician, that Plaintiff would be capable of light work, more likely in the range from sedentary to light,

––––––––––––––––––––

more a day.  R. 346 (this is independent of her testimony at the first hearing).  It was noted that she was admitted with the diagnosis of alcohol abuse and depression, and "[m]edically, the patient was placed on alcohol withdrawal, as she was shaking, extremely tremulous, restless, and *prone to panic attacks.*"  R. 347.  This is evidence that Plaintiff's panic attacks are a symptom of alcoholism.

with no lifting of anything greater than 10 pounds, no overhead work, and no repetitive

shoulder activity.  R. 40.

On May 18, 1993, Plaintiff fell at work.  R. 316.  She suffered rib fractures and

contusions.  R. 314.  She was seen by Tim M. Smith, M.D. on May 21, 1993, and had

"pretty bad" bruising on her shoulder.  R. 312.  An x-ray on July 8, 1993, revealed disc

space narrowing at the C5-C6 level with bilateral neural foraminal encroachment.  R.

310.  By July 15, 1993, she was still having left shoulder pain and Dr. Smith felt he

needed to refer her to Dr. McArthur.  R. 309.

On August 18, 1993, Plaintiff was seen by W. R. McArthur, M.D.  R. 371.  Dr.

McArthur noted that Plaintiff had landed on her left shoulder in the fall.  *Id.*  She said

that since then, she had had chronic pain radiating down the arm.  *Id.*  He noted that an

x-ray of her cervical spine "reveals advanced cervical spondylosis."[13]  *Id.*  The x-ray of

the shoulder was "not particularly revealing."  *Id.*  On September 1, 1993, Dr. McArthur

injected Lidocaine into Plaintiff's shoulder.  *Id.*  On September 20, 1993, Dr. McArthur

noted from an MRI that Plaintiff had a "probable tear of the supraspinatus tendon."  R.

375.  He held off letting her return to light work.  *Id.*

Plaintiff returned to Dr. McArthur on October 15, 1993, complaining of increased

pain in the left shoulder, and examination revealed "positive impingement signs and

positive A/C stress pain."  R. 374.  The shoulder was injected with Triamcinolone,

Deximethazone, DepoMedrol, and Lidocaine.  *Id.*

---

[13] Spondylosis is the ankylosis of a vertebral joint or degenerative spinal changes
due to osteoarthritis.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.  Ankylosis is the
immobility and consolidation of a joint due to disease, injury, or surgical procedure.  *Id.*

Plaintiff was seen again on March 23, 1994, with continued pain.  She had positive impingement sign, no atrophy, and range of motion seemed "pretty good."  R. 373.  A second opinion as to diagnostic arthroscopy was needed.  *Id.*  On June 15, 1994, Dr. McArthur noted that diagnostic arthroscopy was needed.  R. 372.  Plaintiff continued to have left shoulder pain.  *Id.*

On July 6, 1994, Dr. McArthur's assessment was impingement syndrome of the left shoulder, and he saw Plaintiff "for pre-op" before the arthroscopy. R. 371.  The arthroscopic repair for the impingement syndrome occurred on July 7, 1994.  R. 369.  The post-operative diagnosis was severe impingement syndrom of the left shoulder, with some degenerative joint disease of the glenohumeral joint.  R. 337.  Plaintiff was seen by Dr. McArthur on July 11, 1994, July 19, 1994, August 19, 1994, and November 2, 1994.  R. 369.  She underwent physical therapy during these months.  *Id.*

On April 4, 1995, Dr. McArthur determined that Plaintiff had reached maximum medical improvement, still had "myofascial[14] syndrome but negative impingement signs," and had a twelve percent permanent impairment as a result of the injury to her left shoulder.  R. 368.  On March 20, 1996, Dr. McArthur saw Plaintiff because she continued to have pain.  R. 361.  He found by x-ray that Plaintiff had degenerative disease of the cervical spine, and he said it appeared that there was "some encroachment of the nerve roots at 5-6;" he referred Plaintiff to a neurologist.  *Id.*  Of importance to the decision of the ALJ, he said that Plaintiff

---

[14] Myofascial is pertaining to or involving the fascia surrounding and associated with muscle tissue.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

could be a candidate for employment as an injured worker at maximum
light duty, more likely in the neighborhood of sedentary to light.  Her
restrictions would be no over head work, no lifting greater tha[n] 10
pounds for any period of time, no repetitive shoulder activity.  These
restrictions probably are fairly permanent, depending on what the
neurologist finds in her neck.

*Id.*

The ALJ next noted that Dr. Stringer, an independent medical examiner for

Plaintiff's worker's compensation claim (not a treating source), reported that Plaintiff had

reached maximum medical improvement with a 4% impairment rating to her body as a

whole.  R. 40.  He observed that Dr. Stringer had said that Plaintiff would not be able to

work as a waitress, but would be employable as a hostess or at a job that did not

require repetitive arm motion of her left arm or shoulder.  *Id.*  This evidence comes from

an examination in 1996 by Dr. Stringer.  On April 15, 1996, Merle P. Stringer, M.D.,

found that Plaintiff had neck pain, but with no evidence of nerve root compression.  R.

694.  He found by MRI that Plaintiff had degenerative changes of C5-C6, but without

definite cord or nerve root compression.  *Id.*  He said that Plaintiff had myofascial left

shoulder pain, with relief from impingement syndrome by surgery.  *Id.*  He noted that Dr.

McArthur had assigned a 12% impairment rating for her left shoulder impairments (a

month earlier).  R. 695.  He found that Plaintiff had a whole body impairment of 4%,

considering all impairments.  *Id.*  He said she was not employable as a waitress, but

could work as a hostess or in some other job without repetitive left arm and shoulder

motion.  R. 694.

The ALJ did not mention the evidence of an examination on July 9, 1996, by

Lieutenant Commander Robert B. Lurate, an orthopedic specialist, but that evidence

should be mentioned here since it occurred in 1996.  R. 411-412.  Dr. Lurate

determined that Plaintiff had "impingement syndrome of the right shoulder."  R. 411.  He

planned to schedule Plaintiff for a "subacromial decompression."  *Id.*  He also provided

a steroid injection of the right shoulder.  R. 412.

The next finding by the ALJ was that after July, 1996, Plaintiff was treated only

sporadically, and did not seek medical treatment again until July, 1997, when she saw

Dr. Jesalva to obtain blood pressure medication.  R. 40.  She did not return to Dr.

Jesalva until March, 1998, when she came for help to recover from alcoholism and

smelled of alcohol.  *Id.*  On July 16, 1997, Plaintiff saw Dr. Jesalva for blood pressure

medicine.  R. 520.  He noted that she was anxious, and he prescribed Norvasc[15] and

Desyrel.  *Id.*  Plaintiff returned on March 20, 1998, eight months later, to talk about

"alcoholic recovery."  *Id.*  She reported she had been an alcoholic for the previous four

years and smelled of alcohol.  R. 519.

The ALJ next discussed the opinion of Dr. Amin Abdelghany, discrediting his

opinion.  R. 41-42.  Dr. Amin Abdelghany examined Plaintiff on a consultative basis on

October 29, 1998, and is evidence favorable to her claim of disability.  R. 494-497.

Plaintiff complained of pain in her left shoulder and right elbow, and problems with her

equilibrium.  R. 494.  Plaintiff reported that on the previous night, she had been beaten

by her husband, and that she had quit alcohol four years earlier but had started drinking

again two weeks earlier.  *Id.*  Dr. Abdelghany observed mild tenderness over the lower

lumbar area, with no paravertebral spasm.  R. 495.  He found decreased range of

---

[15] Norvasc is indicated for the treatment of hypertension.  PHYSICIANS' DESK
REFERENCE (2004), p. 2615.

motion of the left shoulder, and "extreme muscle wasting with very decreased muscle mass over both anterior and anterior groups of the thighs, legs, and arms."  *Id*.  She was thought to be "very thin" and weighed 97 pounds.  *Id*.  He found, however, that Plaintiff had "normal tone, power, and coordination," gait was normal, and she could do heel and toe walking "with little difficulty."  R. 496.  He said "[t]here were no motor power deficits in the extremities, though she had decreased muscle mass in both upper and lower extremities."  *Id*.  Straight leg raising, however, was positive bilaterally.  *Id*.  Dr. Abdelghany's assessment was chronic left shoulder pain, severe muscle wasting over all the extremities, chronic right elbow pain, history of unbalanced equilibrium and frequent falls, uncontrolled hypertension without complications, and a history of brain surgery.  *Id*.  With respect to Plaintiff's functional ability, Dr. Abdelghany determined that Plaintiff "will be able to sit, stand, and walk *with long breaks in between.*  It would be better to avoid any lifting, carrying, or handling of objects."  *Id*. (emphasis added).

Dr. Abdelghany examined Plaintiff again on a consultative basis on April 17, 2002.  R. 853.  Plaintiff complained of severe back pain in the mid back since 1994.  *Id*.  She also complained of severe neck pain in the lower neck and radiating into the shoulders, especially on the left.  *Id*.  She complained of weakness and fatigue.  *Id*.  Dr. Abdelghany noted that her medical history was significant, *inter alia*, for degenerative joint disease and osteoporosis.  *Id*.  She reported that she drank alcohol moderately, though she said she used to drink a lot of alcohol ten to fourteen years earlier.  *Id*.  Dr. Abdelghany thought that Plaintiff looked underweight; she weighed 105 pounds and was five feet two inches tall.  R. 854.  He found that Plaintiff's neck had "tender mobility in all directions."  *Id*.  He found that Plaintiff's spine

> shows kyphosis,[16] tenderness especially the lower thoracic and upper
> lumbar spine.  Joints show advanced DJD [degenerative joint disease]
> most pronounced on the left shoulder joint and cervical spine. . . .  Left
> shoulder locks on mobility.

R. 854.  He found that Plaintiff had normal motor power, coordination, and tone, but

reflexes were decreased in the upper and lower extremities.  R. 855.  Dr. Abdelghany

noted from the medical records that Plaintiff had cervical spondylosis, bilateral cervical

radiculopathy[17] (left more than right), cervical disk disease, a history of many cervical

steroid injections, osteopenia[18] and osteoporosis by Dexa Scan, and, by MRI,

degenerative changes at C5-C6, uncovertebral joint hypertrophy, and bilateral foraminal

effacement.  *Id*.  Dr. Abdelghany found "limited mobility of the spine, of the left shoulder

joint, and of the neck."  R. 856.  There was tenderness at the lower cervical spine and

junction of the thoracic and lumbar spine, and straight leg raising was positive.  *Id*.  He

found decreased muscle mass of the upper and lower extremities.  *Id*.  He found that

repetitive muscle testing "reproduced" fatigue in the neck, left shoulder joint, and

thoracic and lumbar spine.  He found limited range of motion in Plaintiff's cervical spine,

lumbar spine, and shoulder.  R. 857.  Dr. Abdelghany concluded that with respect to

---

[16] Kyphosis is the abnormally increased convexity in the curvature of the thoracic spine as viewed from the side; called also hunchback.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

[17] Radiculopathy is the disease of the nerve roots.  Cervical radiculopathy often manifests as neck or shoulder pain.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

[18] Osteopenia is reduced mass due to a decrease in the rate of osteoid synthesis to a level insufficient to compensate normal bone lysis (disintegration).  The term is also used to refer to any decrease in bone mass below the normal.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

functional ability, Plaintiff "will be able to stand and walk *only for short periods.* She cannot do any lifting, carrying, or handling of objects." R. 856 (emphasis added).

The ALJ discounted Dr. Abdelghany's first opinion because Dr. Abdelghany did not "identify any medically determinable impairment that could reasonable be expected to limit the claimant's ability to sit, stand, and walk." R. 41. That is true with respect to the first opinion, though Dr. Abdelghany did identify several objective medical *signs* consistent with the functional limitations he assigned, that is, decreased range of motion of the left shoulder, extreme muscle wasting (though without motor loss), and positive straight leg raising.

The ALJ discounted Dr. Abdelghany's second opinion for the same reason. R. 41. This was error. In his second opinion, Dr. Abdelghany noted a series of medically determined *impairments* that reasonably could be expected to limit Plaintiff's ability to sit, stand, and walk. The list includes: cervical spondylosis, kyphosis of the spine, bilateral cervical radiculopathy, degenerative joint disease of multiple joints, especially of the left shoulder, tendinitis of the left shoulder joint, and osteoporosis. R. 855. The same list of medically determined impairments should have been considered by the ALJ when he considered the first opinion as it was in the record and the ALJ must consider all of the evidence in the record.

The ALJ further discounted Dr. Abdelghany's first opinion because although he found that Plaintiff had "extreme muscle wasting," he also found that her neurological, motor, and sensory functions were normal, her gait was normal, and she was able to heel and toe walk without difficulty. R. 41. This is an accurate observation of Dr. Abdelghany's findings.

The ALJ also decided that Dr. Abdelghany's opinion was not entitled to any weight because Dr. McArthur had found that Plaintiff could perform work between sedentary and light, with no overhead work, no lifting greater than 10 pounds for any period of time, and no repetitive shoulder activity.  R. 41.  He thought that the limitations found by Dr. McArthur "could reasonably be expected to emanate from her shoulder and cervical spine disorders."  *Id.*  The ALJ also noted the opinion of Dr. Stringer, which found that Plaintiff "would be employable as a hostess or in any job that did not require repetitive motion of her left arm or shoulder."  *Id.*  The ALJ noted that Dr. McArthur was a treating physician, while Dr. Abdelghany was only a consultative examiner.[19]  *Id.*

The ALJ also discounted Dr. Abdelghany's opinion in reliance upon findings by E. Jacob, M.D., a board certified neurologist.  R. 42.  He found that Dr. Jacob said that Plaintiff could walk normally, her grip strength and fine manipulation were adequate, she was able to dress and turn doorknobs, and there was no mention of extreme muscle wasting.  *Id.*

Other than the finding concerning the lack of evidence of muscle wasting, which is not supported by substantial evidence in the record,[20] the ALJ accurately reported a few of Dr. Jacob's findings.  But Dr. Jacob's report is significantly more comprehensive

---

[19] The opinion of a claimant's treating physician must be accorded substantial weight by the Commissioner unless good cause is shown to the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  Generally, a treating physician's medical opinion (Dr. McArthur) is entitled to greater weight than the opinion of a consulting physician (Dr. Abdelghany).  Wilson v. Heckler, 734 F.2d 513, 516 (11th Cir. 1984).

[20] On September 9, 2000, Dr. Jacob found that Plaintiff had "generalized wasting of the hand muscles and leg muscles" and "generalized loss of muscle volume."  R. 722-723.  On July 12, 1996, Dr. Zumarraga found that Plaintiff was "sick, underweight, and somewhat emaciated."  R. 402.

than described by the Administrative Law Judge, and many of the findings are fully supportive of Plaintiff's claim of physical disability.

Dr. Jacob examined Plaintiff on a consultative basis on September 9, 2000.  R. 720.  Dr. Jacob first noted that Plaintiff had a long-standing history of neck, mid back, and lower back pain, and at least two head traumas.  *Id.*  He also noted that she had a "significant history of severe depression, agoraphobia and panic attacks," severe alcohol abuse, and is a heavy smoker.  R. 720.  Dr. Jacob provided the following synopsis as to Plaintiff's subjective complaints of pain and limitation of motion:

> The pain over the neck is present all the time.  It radiates from the top of the head into the neck and back and forth.  This makes her nauseous.  However, there is no vomiting.  When the headache is severe, the patient has photophobia and aversion to sound.  The pain from the neck also radiates between the shoulder blades and into the upper extremities.  The patient complains of numbness and weakness of both hands.  She also has diffuse tenderness over the thoracic spine and also pain over the sacrum as well as over the coccyx.  The pain from the lumbar area radiates into both lower extremities.  The patient has persistent tingling and numbness of the hands.  She also has [a] burning sensation in the feet.  The symptoms are worse at night.  The patient has panic type of attacks when she is outdoors.  The panic attacks usually come with tightness in her chest as if she cannot breathe.  She will hyperventilate, sweat profusely as if she is going to die.  The patient has gone to the emergency room because she felt that she was having a heart attack at the time of the panic attack.

R. 720-721.

Dr. Jacob noted that among the medications prescribed for Plaintiff were

Darvocet,[21] Librium, Zoloft, and Vioxx.[22]  R. 721.  Upon physical examination, Dr. Jacob

found:

> In the cervical spine, there is shortening.  There is paravertebral muscle
> tenderness bilaterally.  There is diffuse tenderness of the cervical, thoracic
> and lumbar spinous processes.  There is tenderness over the sacrum and
> coccyx.
>
> See the section on range of movement of the spine [discussed ahead].
> Straight leg raising is positive bilaterally.  Patient could not walk on her
> toes or heels or tandem.  However, she was able to stand on her toes as
> well as heels.  The difficulty is because of loss of balance.
>
> Arteriosclerotic changes are seen in the fundi.[[23]] . . .
>
> There is generalized wasting of the hand muscles and leg muscles.  Deep
> tendon reflexes are depressed.  There is reduced pinprick, cold and touch
> sensation in the hands and feet bilaterally in a glove and stocking pattern.
> Vibration sensation is absent in the ankles.

R. 722.

As related to Plaintiff's physical limitations, Dr. Jacob set forth the following as his

"impression:"

> 1.    Neck, mid back and lower back pain with signs and symptoms of
>        radiculopathy.
>
> 2.    Clinical examination suggests possible osteoporosis.
>
> 3.    Status post head trauma x 2.

---

[21] Darvocet-N 50 or 100 contains propoxyphene hydrochloride, a mild narcotic
analgesic related to methadone.  PHYSICIANS' DESK REFERENCE (2004), pp. 403-404.

[22] A nonsteroidal anti-inflammatory drug (NSAID).  PHYSICIANS' DESK REFERENCE
(2004), p. 2108.

[23] Genitive plural of fundus, which is the bottom or base of something.  DORLAND'S
ILLUSTRATED MEDICAL DICTIONARY.

4.      Brain surgery following head trauma x 1.

                    *               *               *

7.      Signs of generalized sensorimotor peripheral neuropathy.

                    *               *               *

R. 722.

In the section entitled "Physical Consultative Examination," Dr. Jacob made the

following findings:[24]

> All major joints were examined.  The hands showed deformity.  The
> cervical lordosis was exaggerated.  Thoracic kyphosis was exaggerated.
> There was straightening of the lumbar lordosis.  There was diffuse
> tenderness over the cervical, thoracic and lumbar spinous processes.
> There was also paravertebral muscle spasm in this area. . . .
>
> The patient has reduced pinprick, touch and cold sensation in the hands
> and feet bilaterally suggestive of generalized sensorimotor peripheral
> neuropathy.  Straight leg raising is positive at 60-70 degrees on lying
> down as well as sitting up.
>
> The patient walks normally without any assistive device.  Grip strength
> and fine manipulation are adequate.  The patient was able to get dressed
> and undressed, buttoned her blouse, turned door knobs, etc.
>
> The patient does have generalized muscle weakness with generalized
> loss of muscle volume.  This may be due to poor nutrition or some form of
> wasting disease including [possible] malignancy.
>
> The patient is already fatigued and fragile, and I did not put her through
> repetitive muscle testing.  In addition, I do not have the facilities in a
> neurology office to do repetitive muscle testing.
>
> The patient did not show any psychotic or neurotic signs, and she related
> to me and my staff quite well.  Her personal hygiene and habits are
> excellent.

R. 722-723.

---

[24] The numbering of these paragraphs is omitted.

In the section concerning range of movement of the spine, Dr. Jacob found that Plaintiff's range of motion was significantly limited in the cervical spine.  Where 45 degrees was normal, forward flexion was 20-30 degrees, extension was 20 degrees, lateral flexion on the left and right was 10 degrees.  R. 724.  Rotation on the right and left was only 45 degrees where 80 degrees was normal.  *Id.*  In the thoracolumbar spine, forward flexion was only 45 degrees where 90 degrees was normal.  *Id.* Extension, lateral flexion and rotation on the right and left was only 10 degrees where 45 degrees was normal.  *Id.*  In the shoulder region, normal for forward elevation was 150 degrees, but Plaintiff could move only 90 degrees on the left and right.  In backward elevation on the left and right she could move only 30 degrees where 40 degrees was normal.  *Id.*  Abduction on the right and left was 80 degrees where 150 degrees was normal.  *Id.*  Adduction on the right and left was 10 degrees where 30 degrees was normal.  *Id.*  External rotation on the right and left was less than 45 degrees where normal was 90 degrees.  *Id.*  Internal rotation on the right and left was 20 degrees where 40 degrees was normal.  *Id.*  Plaintiff also had significant limitations of movement in her elbow, wrists, hand, hips, knee, ankle and foot, and great toe.  R. 724-725.

The ALJ also cited two reports from Dr. Elzawahry as reasons to discount Dr. Abdelghany's opinion.  The first, in April, 2001, was said to contain findings that Plaintiff had normal motor tone, power, coordination, and reflexes, her neurological examination was normal, walking tests were normal, and there was no observation of extreme muscle wasting.  R. 42, citing R. 818.  The second was in March, 2002, where Dr. Elzawahry said that while Plaintiff was suffering from decreased cervical range of

motion, this was without deformity, grip strength was normal, her left shoulder arthritis was without spasms, and there was no note of muscle wasting.  *Id.*, citing R. 817.

All of the evidence in the treatment notes of Dr. Elzawahry will be set forth here. On December 27, 1999, Plaintiff came to Dr. Elzawahry complaining of pain for the past month radiating down the neck and spine to the tailbone.  R. 847.  Plaintiff reported sharp intermittent pain radiating to both arms, more pronounced on the left, and a dull ache in the back of the neck.  *Id.*  He noted no history of weakness of the arms or legs. *Id.*  Dr. Elzawahry noted that Plaintiff had a thin build (five feet two inches tall and 100 pounds).  R. 848.  "Sensory system examination revealed intact sensations to pin prick, light touch and position bilaterally.  Motor system examination revealed normal strength and tone in all extremities."  *Id.*  There were "mild paraspinal spasms in the cervical region."  *Id.*  His impression was, *inter alia*, cervical spondylosis bilateral cervical radiculopathy, left more than right.  *Id.*  Dr. Elzawahry recommended x-ray of the cervical spine and NCV[25] and EMG[26] testing of the cervical paraspinal muscles and upper extremities.  R. 848.

On December 29, 1999, Plaintiff had x-rays of her cervical spine.  R. 846.  These revealed degenerative disk disease at C5-C6 with moderate right C5-C6 foraminal stenosis.  *Id.*  The NCV was normal for the upper extremities.  R. 845.  The EMG results were found to be "consistent with posterior primary rami[[27]] spinal root irritation in the

---

[25] Nerve conduction velocity testing.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

[26] Electromyogram testing.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

[27] Rami is the genitive plural of ramus, anatomic terminology for a smaller structure given off by a larger one, or into which the larger structure, such as a blood vessel or

lower cervical paraspinous region."  *Id.*  On January 19, 2000, Dr. Elzawahry noted that

these test results were consistent with neck pain with radicular symptoms and ordered

an MRI of Plaintiff's cervical spine.  R. 843.  An MRI on January 25, 2000, revealed

> uncovertebral[28] joint hypertrophy with disk protrusion and disk space
> narrowing of C5-6, which causes bilateral neural foraminal effacement that
> is moderate to severe in nature.  There is no evidence for cord
> impingement.  There are no other disk bulges or disk herniation noted.

R. 841.  The impression was degenerative changes at C5-6, uncovertebral joint

hypertrophy, and bilateral neural foraminal effacement.  *Id.*

On May 15, 2000, Dr. Elzawahry saw Plaintiff upon complaints of "increasing

neck, shoulder and arm pain, worse with movement and activity."  R. 836, 826.  He

noted that a bone scan had shown abnormalities consistent with fractures in the lower

lumbar region and the anterior right chest.  *Id.*  Sensory and motor system exams were

normal.  *Id.*  His diagnosis was rib fractures,[29] cervical disk disease, and severe

osteoarthropathy of the left shoulder.  *Id.*  A DEXA bone density scan on May 23, 2000,

revealed "osteopenia with bone mineral density in the lumbar spine between one and

two standard[] deviations below the mean peak adult bone mass . . . ."  R. 830, 827.

The bone density of Plaintiff's hip was 2.2 standard deviations below the mean.  R. 828,

827.

---

nerve, divides.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

[28] Pertaining to or affecting the uncinate processes of a vertebra.  Uncinate means
shaped like a hook.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

[29] Plaintiff had "sustained a fall and perhaps fractured some ribs."  R. 843.  The date
of this notation is obscured, and could be anywhere from January to May 13, 2000.

On July 18, 2000, Plaintiff again was seen by Dr. Elzawahry, complaining of

"increasing pain that radiates to the shoulder and arm associated with numbness and

tingling and burning sensation, worse with movement and activity.  She continues to

have mid back pain, worse with movement and activity."  R. 826.  Upon examination,

Dr. Elzawahry found:

> There is tenderness over the posterior aspect of the neck.  Positive
> Spurling[30] sign.  Movement of the neck is extremely uncomfortable. . . .

R. 826.  Motor, sensory, and reflex tests were normal.  *Id.*  Dr. Elzawahry's assessment

was:

> cervical disk disease with radicular symptoms with evidence of changes at
> C5-6.  Positive EMG and NCV of the upper extremities with findings
> consistent with posterior primary rami spinal root irritation in the lower
> cervical paraspinous region.  Osteoporosis.

R. 826.  He concluded that a trial of epidural cervical steroids was warranted.  *Id.*

On August 21, 2000, when Plaintiff came for the epidural steroids, it was noted

that she had "persistent and severe neck pain with radicular symptoms with [a] history

of cervical disc disease."  R. 825.  She received second and third injections on

September 11 and 18, 2000.  R. 824, 823.

On September 18, 2000, Dr. Elzawahry completed a questionnaire for the Florida

Department of Health (which was part of the mental health questionnaire discussed

above).  R. 821-822.  When asked to described "any loss of motion" or "deformity of the

---

[30] Spurling's maneuver or sign is used for evaluation of cervical spine radiculopathy.
The patient laterally bends the neck to each side while maintaining a posture of cervical
extension.  Pain intensified with ipsilateral bending strongly suggests a diagnosis of
radiculopathy.  Pain with contralateral bending suggests musculo-ligamentous origin.
UNIVERSITY OF FLORIDA, COLLEGE OF MEDICINE, available at:
http://www.med.ufl.edu/rheum/rheumTests.htm.

major joints," he said that Plaintiff had fractures of the ribs and lumbar vertebra, osteoarthropathy with "shoulder severe," cervical disk disease, and osteoporosis.  R. 821.  When asked to describe the extent of any loss of motion of the spine, Dr. Elzawahry indicated that Plaintiff had decreased flexion, rotation, and extension of the lumbar spine, decreased rotation of the cervical spine, and decreased reflexes of both the upper and lower [presumably, extremities].  *Id*.  He noted her grip strength was basically intact (4/5) and her fine dexterity was normal.  *Id*.  He said she had an antalgic gait, but could squat and walk on her toes and heels.  *Id*.

On October 9, 2000, Dr. Elzawahry found that Plaintiff had "responded favorably to the injections."  R. 820.  The diagnosis remained the same as above.  *Id*.

On April 16, 2001, Dr. Elzawahry said that

unfortunately she is still having increasing neck and back pain, radicular in nature, worse with movement and activity.  Had epidural steroids with limited response.  Initially she had fair response, but now the symptoms recurred.  She has tried physical therapy in the past with limited response.

R. 818.  On examination he found "tenderness over the posterior aspect of the neck and limitation of movement of the neck with positive Spurling sign."  *Id*.  She had normal tone, power, coordination, and reflexes in both upper and lower extremities, and gait was normal.  *Id*.  The diagnosis was "neck pain with radicular symptoms with evidence of cervical disc disease noted on previous studies with limited benefits to epidural steroids."  *Id*.

Finally, on March 28, 2002, Dr. Elzawahry filled out the same form for the Florida Department of Health as discussed above.  He found that Plaintiff's cervical range of motion was slightly decreased without deformity, that she had left shoulder arthritis with

no changes but no spasms, that her grip strength and dexterity were normal, and her gait and station were normal.  R. 817.  There is no indication that Dr. Elzawahry had treated Plaintiff since April 16, 2001.

Finally, the ALJ relied upon the consultative examination of Kris Lewandowski, M.D., in July, 2003.  R. 42.  He found that Dr. Lewandowski found that Plaintiff was comfortable, could bend her back 90 degrees, had 100% mobility in the upper and lower extremities, her muscles were normal size, and her strength was normal bilaterally.  *Id.* This is an accurate summation of the findings of Dr. Lewandowksi.  R. 607.  Every test conducted by Dr. Lewandowski on July 8, 2003, recorded normal results.  *Id.*  Dr. Lewandowski's "impressions" were:

> This 61 year old female patient complains about back pain for years
> without radicular symptoms.  She fractured the left [illegible] but she
> seems to recover from it.  Patient ambulates without limp slowly.  There is
> no neurological impairment and her balance is good.

R. 607.

In summary, the findings of Dr. McArthur and Dr. Stringer in 1996 were substantial evidence in the record to support the ALJ's finding that Plaintiff did not prove disability before expiration of her insured status, on September 30, 1996.  But those findings were stale by the time that Dr. Abdelghany and Dr. Jacob rendered their consultative opinions, and their opinions are fully supported by the objective medical findings from Dr. Elzawahry's notes.  Dr. Abdelghany saw Plaintiff in 1998 and 2002. Dr. Jacob saw Plaintiff in September, 2000.  Dr. Elzawahry treated Plaintiff from December, 1999, to April 16, 2001.

Most notably, Dr. Elzawahry found that movement of Plaintiff's neck was extremely painful, her osteoarthropathy of the shoulder was severe, she had positive EMG and NCV of the upper extremities with findings consistent with posterior primary rami spinal root irritation in the lower cervical paraspinous region, by MRI it was found that she had "uncovertebral joint hypertrophy with disk protrusion and disk space narrowing of C5-6, which causes bilateral neural foraminal effacement that is *moderate to severe in nature,"* she had radicular symptoms in the cervical region and shoulders, she suffered from osteoporosis, and when he last saw her, on April 16, 2001, she was "still having increasing neck and back pain, radicular in nature, worse with movement and activity," and steroid injections had failed to help the pain.  Dr. Elzawahry was a treating physician, and his findings should have been given substantial weight by the Administrative Law Judge.[31]

The objective findings of Dr. Elzawahry are identical to the findings of Dr. Abdelghany and Dr. Jacob.  Dr. Jacob's objective findings will not be repeated here, but his findings fully support the conclusion of Dr. Abdelghany that Plaintiff would need long periods of rest between periods of standing, walking, or sitting, and that she could stand or walk for only short periods of time.  As Dr. Jacob found during his examination, Plaintiff was "already fatigued and fragile."

The only contrary evidence is the consultative examination by Dr. Lewandowski, finding that Plaintiff had no physical limitations whatsoever.  Even Dr. McArthur, seven

---

[31] "Where the Secretary has ignored or failed properly to refute a treating physician's testimony, we hold as a matter of law that he has accepted it as true."  MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986).

to eight years earlier, found more pain and limitation than did Dr. Lewandowski.  In any event, the consultative examination of Dr. Lewandowski is not substantial evidence in the record to discount the findings of the treating physician, Dr. Elzawahry, or the considerably more extensive consultative findings of Dr. Abdelghany and Dr. Jacob.

The ALJ also found that even if the opinion of Dr. Abdelghany was to be given controlling weight, the "evidence does not support a finding that the limitations identified by Dr. Abselghany [sic] persisted for 12 consecutive months."  R. 41.  Cited in support of this finding is that Dr. Abdelghany examined Plaintiff on October 29, 1998, and Plaintiff did not seek further treatment until she saw Dr. Elzawahry on December 27, 1999, and Dr. Elzawahry did not find muscle wasting.  R. 41-42.  Dr. Elzawahry treated Plaintiff from December 27, 1999, to April 16, 2001, making the objective medical findings discussed above to support Plaintiff's claim of disability.  These findings were exactly the same as made by Dr. Abdelghany on October 29, 1998, and again by Dr. Jacob on September 9, 2000.  By April 16, 2001, Dr. Elzawahry found that steroid injections had not helped.  There is *no* evidence to support the ALJ's conclusion that Plaintiff's condition did not last more than 12 consecutive months.  The evidence shows that Plaintiff's spinal and shoulder conditions have lasted at least since her fall and shoulder injury in 1993, and have only grown worse as the years have passed.

### Evaluation of Plaintiff's pain testimony

Pain and other symptoms reasonably attributed to a medically determinable impairment are relevant evidence for determining residual functional capacity.  Social Security Ruling 96-8p, p. 4.  Pain and other symptoms may affect either exertional or non-exertional capacity, or both.  *Id.*, p. 6.

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing:  (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.  *See Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so.  *See Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).  Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true.  *See Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002).  The reasons articulated for

disregarding the claimant's subjective pain testimony must be based upon substantial

evidence.  Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532

(11th Cir. 1991).  It is not necessary that the ALJ expressly identify this circuit's pain

standard if his findings "leave no doubt as to the appropriate result" under the law.

Landry v. Heckler, 782 F.2d 1551, 1553-1554 (11th Cir. 1986).

"A claimant's subjective testimony supported by medical evidence that satisfies

the pain standards is itself sufficient to support a finding of disability.  Indeed, in certain

situations, pain alone can be disabling, even when its existence is unsupported by

objective evidence."  Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995) (citations

omitted).  "[W]here proof of a disability is based upon subjective evidence and a

credibility determination is, therefore, a critical factor in the Secretary's decision, the ALJ

must either explicitly discredit such testimony or the implication must be so clear as to

amount to a specific credibility finding."  *Id.* at 1562, *quoting*, Tieniber v. Heckler, 720

F.2d 1251, 1255 (11th Cir. 1983).

The ALJ placed much emphasis upon Plaintiff's inconsistencies about her alcohol

abuse, finding that she had "a history of making false claims about her drinking."  R. 46.

It is true that Plaintiff made false claims about quitting drinking, but that is a kind of prevarication common to the disease of alcoholism.  Further, Plaintiff candidly admitted at her hearing that she had a serious problem with alcohol abuse.  R. 902-903.  There is little reason to believe that these denials about the extent of her addiction would cause Plaintiff to exaggerate her experience of physical pain.

The ALJ also found Plaintiff not a credible witness because of inconsistencies in her description of her past work.  R. 46.  This is a quibble about nothing, and is not substantial evidence in the record to disbelieve Plaintiff's pain testimony.  Most of the inconsistencies rely upon subtle distinctions between work as a waitress, head waitress, hostess, or supervisor cashier.  The simple fact is that these jobs were in restaurants and involved greeting, seating, and serving customers, sometimes supervising other waitresses, accounting for money, and, except for the hostess job, often required the lifting of 20 pound objects.  The jobs were the most important as past relevant work because Plaintiff spent most of her work life in such jobs.

One of the other jobs that the ALJ faulted Plaintiff for having not consistently mentioned was a job as a hotel front desk clerk.  R. 47.  Plaintiff did that job *25 years* before the hearing, when she first moved to Panama City, Florida.  R. 944.  The next job, 24 years before the hearing, was a bartender job.  R. 945-946.  The ALJ faults Plaintiff for inconsistently mentioning this job.  R. 46.  The failure to mention work performed so long ago is not especially relevant to the credibility of Plaintiff.  Likewise, the Popeye's job was "a long time ago," in the 1980's, and the ALJ determined that it was "outside the timeframe" and irrelevant to the issue of disability.  R. 984-986.  When Plaintiff was examined about her work for a Junior Food convenience store, she

explained "I've worked for over 40 years and I'm sure there's something I've forgotten."[32]
R. 985.  Finally, and of greatest important, there was no deception by Plaintiff.  *All* of
these jobs were listed *long ago*, in Plaintiff's vocational report dated September 11,
1998.  R. 180-185.

In summary, the Administrative Law Judge's reasons for discounting Plaintiff's
pain testimony are not based upon substantial evidence in the record.  Further, the
medical evidence in this case fully establishes both alternatives for the pain testimony
evaluation test.  There is evidence of an underlying medical condition and an
abundance of objective medical evidence confirming the severity of the alleged pain or
of  medical conditions that can reasonably be expected to give rise to the claimed pain.
The physical impairments have been confirmed by x-ray, MRI, NVC, EMG, and physical
examination techniques (straight leg raising, Spurling's test, range of motion tests,
muscle wasting).  None of the physicians, including Dr. McArthur, doubted that Plaintiff
experienced severe pain.  The last treating physician, Dr. Elzawahry, found that
"movement of the neck is extremely uncomfortable."  R. 826.

That said, Plaintiff's pain testimony was focused upon her experience of pain in
the recent past, at the time of the administrative hearings.  It was not evidence to
support her claim for disability prior to the expiration of her disability insurance status,
on September 30, 1996.  It was, however, evidence fully supportive of her SSI
application.

---

[32] The ALJ said: "Ma'am, it's not meant as incrimination, we're only trying to get the
jobs you legitimately did during the time period that I'm mandated to consider so – " R.
986.  It did not turn out that way, however, when the ALJ sat down to prepare his
opinion.

**Conclusion**

The Commissioner's unfavorable disposition of Plaintiff's application for disability insurance benefits is supported by substantial evidence in the record and must be affirmed.  The substantial evidence in the record supports the Commissioner's conclusion that Plaintiff did not demonstrate onset of disability before September 30, 1996.

The Commissioner's unfavorable disposition of Plaintiff's application for SSI benefits should be reversed.  That decision is not supported by substantial evidence in the record.

This leaves a difficult problem of ascertaining the onset date, and a problem not addressed by either party.  There is no need for further briefing, however, as the Commissioner has the expertise to determine an onset date.

This Court does not have before it sufficient information about the onset date of disability for the latest SSI application.  Apparently the last two SSI applications were granted, but then Plaintiff was found to be ineligible due to the amount of her husband's income.  This would probably mean that Plaintiff's onset date for disability should go back to the earliest SSI application that was granted.

The last SSI application granted was filed on February 4, 2002, and must have had a disability onset date earlier than that.  But the disability onset date seems immaterial as at sometime after February 4, 2002, Plaintiff was found to have been ineligible due to her husband's income.  Benefits under the latest SSI application probably could not begin until after the date of last ineligibility.  It is also unknown

whether Plaintiff is still ineligible.  The Commissioner should make the determinations as to disability onset date, eligibility, and commencement date.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **AFFIRMED** as to the denial of the application for disability insurance benefits and **REVERSED** as to the application for supplemental security income benefits, leaving for the Commissioner the task of determining disability onset date, eligibility, and, if appropriate, commencement date for supplemental security income benefits.

**IN CHAMBERS** at Tallahassee, Florida, on March 21, 2006.


s/    William C. Sherrill, Jr.
WILLIAM C. SHERRILL, JR.
UNITED STATES MAGISTRATE JUDGE


## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**